**Cara Leslie ALEXANDER,
et al., Plaintiffs,**

v.

**FEDERAL BUREAU OF
INVESTIGATION, et
al., Defendants.**

**Nos. Civ. 96–2123 RCL, Civ. 97–1288 RCL.**

United States District Court,
District of Columbia.

July 10, 1998.

Larry Elliot Klayman, Judicial Watch, Inc., Washington, DC, for plaintiffs.

James Jordan Gilligan, Elizabeth Jane Shapiro, Julia Fayngold, U.S. Department of Justice, for FBI and Executive Office of the President.

David Evan Kendall, Nicole Kay Seligman, Paul Benedict Gaffney, Williams & Connolly, Washington, DC, for Hillary Rodham Clinton.

James Franklin Fitzpatrick, Michael R. Geske, Arnold & Porter, Washington, DC, Peter Z. Zimroth, Arnold & Porter, New York City, for Bernard W. Nussbaum.

Randall James Turk, David S. Cohen, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, DC, for Craig Livingstone.

Robert Weinberg, Bredhoff & Kaiser, P.L.L.C., Washington, D.C., Robert Muze, Stein, Mitchell & Mezines, Washington, D.C., for Anthony Marceca.

Anne L. Weismann, Sylvia T. Easer, U.S. Department of Justice, Civil Division, Washington, D.C., for Non–Party Clifford Bernath.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on the sanctions question presented by defendants' Motion for Protective Order or, in the Alternative to Quash or Modify the Subpoena of Clifford Bernath and plaintiffs' Motion to Compel Further Testimony and Further Production of Documents from Clifford Bernath and for Sanctions. In an order dated April 27, 1998, this court denied the government defendants' Motion for Protective Order or, in the Alternative to Quash or Modify the Subpoena of Clifford Bernath and stated that it would consider the issue of the determination of costs and attorneys' fees as raised in plaintiffs' opposition to the government defendants' motion at a separate time. Upon consideration of the submissions of the parties and the relevant law, plaintiffs' request for attorneys' fees and costs is granted and plaintiffs' Motion to Compel Further Testimony and Further Production of Documents from Clifford Bernath and for Sanctions is granted in part and denied in part.

## I. *Background*

As stated in several opinions by this court, the underlying allegations in this case arise from what has become popularly known as "Filegate." According to their complaint, plaintiffs allege that their privacy interests were violated when the Federal Bureau of Investigation ("FBI") improperly handed over to the White House hundreds of FBI files of former political appointees and government employees under the Reagan and Bush Administrations.

On April 13, 1998, this court issued an order permitting plaintiffs to pursue discovery into matters bearing on the obtaining and misuse of governmental files in order for plaintiffs to attempt to create the inference that it is reasonable to conclude that FBI files were obtained and misused in the instant case. *Alexander v. FBI*, C.A. No. 96–2123(RCL), Mem. and Order at 6 (D.D.C. Apr. 13, 1998). Pursuant to that memorandum and order, plaintiffs have pursued their theory that the White House had some role in the release of information from the federal security-clearance form of Linda Tripp. To this end, plaintiffs served Clifford Bernath, former Principal Deputy Assistant to the Secretary of Defense for Public Affairs, with a subpoena ad testificandum and duces tecum.

The subpoena commanded Bernath to appear for deposition on April 24, 1998. On April 23, the government defendants filed a motion for protective order with respect to the deposition of Bernath. In their opposition to the government defendants' motion, plaintiffs requested that this court impose sanctions on the government defendants including attorneys' fees and costs incurred by plaintiffs in preparing the opposition and associated expenses incurred in canceling the deposition. This court denied the government defendants' motion for protective order on April 27, and ordered Bernath to appear to be deposed the following day. The court also indicated that the issue of attorneys' fees and costs would be considered separately.

On the evening of April 27, the government defendants filed a motion to amend the court's order issued earlier that day on the basis that Bernath was in Kansas and ac-cordingly, would not be available to be deposed by plaintiffs on April 28. Bernath was eventually deposed by plaintiffs on April 30.

After conducting the deposition of Bernath, plaintiffs filed a motion to compel further testimony and production of documents from Bernath and requested that this court impose sanctions upon counsel for the government defendants and Bernath. Prior to considering this motion, the court must address plaintiffs' request for attorneys' fees and costs incurred in filing an opposition to the government defendants' original motion for protective order as the request is based on facts immediately preceding Bernath's deposition.

## II. *Analysis*

### A. *Plaintiffs' Request for Attorneys' Fees and Costs Associated with Defendants' Motion for Protective Order with Respect to Clifford Bernath*

In their opposition to the government defendants' motion for protective order with respect to Clifford Bernath, plaintiffs request an award of attorneys' fees and costs, including fees incurred by plaintiffs in preparing the opposition to the motion for protective order and associated expenses incurred in canceling Bernath's deposition. Plaintiffs also seek costs for the videographer appearance scheduled for that day and request that the court hold counsel for the government defendants personally liable for all fees, costs, and expenses in order to "prevent continued misconduct in the future." Pls.' Opp. to Mot. for Protective Order at 9.

Prior to considering the merits of plaintiffs' request, a close examination of the facts immediately preceding Bernath's deposition is necessary. On April 13, 1998, a process server employed by plaintiffs attempted to serve Bernath at his former office at the Pentagon where he was Principal Deputy Assistant to the Secretary of Defense for Public Affairs. The process server was instructed that Bernath was no longer employed at the Pentagon and that he was employed at the offices of the Armed Forces Information Service. As plaintiffs would eventually learn, the Armed Forces Informa-

tion Service is a branch of the Department of Defense and is located in a commercial office building in Alexandria, Virginia. Notwithstanding plaintiffs' misconceived notions regarding his place of employment, Bernath was eventually served with a notice of deposition on April 13 with the deposition scheduled for April 24.

Acting on the erroneous assumption that Bernath was no longer an employee of DOD, on April 20, counsel for plaintiffs, Kevin Pagoda, sent a letter to Bernath stating "[w]e are in the process of obtaining documents from the Pentagon necessary for your deposition and may not be able to do so before your scheduled deposition date of April 24, 1998. We would, therefore be willing to reschedule your deposition for some time after May 6, 1998. Please call our office at your earliest possible convenience so that we may select a mutually agreeable date." Pls.' Opp. to Mot. for Protective Order Ex. 9 at 1 (Letter from Kevin Pagoda to Clifford Bernath (April 20, 1998)). According to the government defendants, Bernath's office forwarded this letter to Brad Weigmann, Special Counsel at the Office of the General Counsel at DOD on the same date. Mot. for Protective Order at 2.

The following day, April 21, Pagoda called Bernath's office and was informed that the letter delivered to Bernath had been forwarded to Weigmann. Later that same day, Pagoda contacted Weigmann, who identified himself as an attorney with DOD, to discuss possible alternate dates for Bernath's deposition. Weigmann indicated that he would contact Bernath to determine his availability on alternate dates and contact plaintiffs' counsel with this information. Plaintiffs contend that it was necessary to postpone the deposition of Bernath because it was their belief that he was no longer an employee of DOD and therefore, plaintiffs would be required to serve a separate subpoena on DOD officials to obtain documents in the possession of DOD that were relevant to the deposition of Bernath.

The government defendants assert that on April 22, Weigmann authorized Elizabeth Shapiro, counsel for the Executive Office of the President ("EOP"), to communicate to plaintiffs' counsel Larry Klayman that Bernath would be available to be deposed until May 15. Shapiro was to communicate this information to Klayman prior to the deposition of Madeleine Grunwald which was to be conducted on April 23. Pagoda contends in a declaration that several unsuccessful attempts were made to contact Weigmann throughout the day on April 22 and as of 8:30 p.m. that evening, Weigmann had failed to return any of the messages left for him by Pagoda. However, Weigmann states in his own declaration that on April 22, he spoke to an individual at plaintiffs' counsel's office, whom he believed to be Don Bustion, to inform him that he would get back to plaintiffs as soon as possible with alternate dates for Bernath's deposition. Notwithstanding the differing versions of the events that transpired that day, no firm alternate date for Bernath's deposition was set on April 22.

In his declaration, Pagoda states that because Weigmann failed to contact him on April 22, he faxed a letter to Weigmann stating that "unless we receive from you an agreement to one of the proposed dates by noon today [April 23], Mr. Bernath's deposition will take place as stated on his subpoena—beginning at 10:00 a.m. on April 24, 1998." Pls.' Opp. to Mot. to Compel Ex. 10 at 1 (Letter from Pagoda to Weigmann (April 23, 1998)). This letter was sent by facsimile transmission at 8:40 a.m. on April 23 to Weigmann's office.

The government defendants state that on April 23, Elizabeth Shapiro attempted to convey to Klayman that Bernath would be available to be deposed on May 15, "but for some inexplicable reason, [Klayman] refused to abide by the agreement to postpone the deposition and suddenly claimed he would require the deposition to go forward [on April 24.]" Mot. for Protective Order at 3. The conversation between Shapiro and Klayman on this issue was captured on the record immediately preceding the deposition of Grunwald. This record reveals that at the beginning of the proceedings, Klayman announced that he would be conducting the deposition of Bernath as originally scheduled on April 24 because no alternate dates had been proposed by Weigmann. After Klay-

man made this announcement, Shapiro stated that she had alternate dates to propose to Klayman. During the colloquy that ensued, it became apparent to Klayman that Bernath was still employed by DOD. Upon reaching this realization, Klayman stated that "one of the reasons why we were proposing that we could move the date was because we had learned that he was no longer employed by the Department of Defense." Grunwald Dep. at 8. It was at this point that Klayman demanded the deposition proceed as scheduled on April 24. Klayman confirmed this position that afternoon in a letter sent to Weigmann.

Two additional letters were sent to plaintiffs' counsel on April 23—one sent to Klayman by Sylvia Kaser, an attorney from the Civil Division of the Department of Justice, responding to Klayman's announcement of plaintiffs' position that Bernath's deposition would proceed on April 24 and the other from Kaser directed to Pagoda and Bustion. Kaser's letter notified Pagoda and Bustion that she would be representing Bernath in his official capacity for the purpose of responding to the subpoena served on Bernath and that all future inquiries and correspondence should be addressed to her. This letter also proposed May 15 as an alternate date for the deposition of Bernath.

In contrast, the letter from Kaser directed at Klayman stated that Klayman's "reversal of position ... and [his] new insistence on proceeding with [the] deposition [on April 24], puts us in an impossible situation, and makes compliance with the subpoena unduly burdensome." Mot. for Protective Order Ex. 5 at 1. Furthermore, Kaser added that in reliance on plaintiffs' initial proposal to change the date of the deposition, Bernath made alternate plans for April 24 and would be unavailable on that date. Id. Kaser also stated that she planned to file a motion for protective order on behalf of Bernath and accordingly, Bernath would not be appearing at the deposition on the following day.

As foreshadowed by Kaser in her letter to Klayman, at 10:36 p.m. on Thursday, April 23, she filed a motion for protective order on behalf of Bernath arguing that the subpoena failed to allow reasonable time for compliance and that compliance with the subpoena would be unduly burdensome in light of plaintiffs' reversal of position. Moreover, the motion for protective order also noted that in reliance on plaintiffs' proposal to postpone the deposition, counsel for Bernath postponed preparation of Bernath until a later date. As stated in the correspondence between the parties, the motion also stated that Bernath had scheduled another matter for April 24 and would be unavailable for the deposition. Plaintiffs filed their opposition to the motion for protective order on Saturday, April 25.

On April 27, this court denied Bernath's motion for protective order and ordered the deposition to proceed on April 28. In response to this order, the government defendants immediately filed a motion to amend the court's order directing that Bernath's deposition go forward the following day. According to this motion, Bernath was on travel in Kansas and the government defendants sought an amendment to the court's April 27 order to provide that his deposition instead take place immediately upon his return to Washington, D.C.

The government defendants state that upon receiving the court's April 27 order, counsel for Bernath was contacted to ascertain Bernath's availability for the deposition scheduled for April 28. According to the government defendants, counsel for Bernath communicated to them that Bernath was in Kansas attending a college reunion where he was scheduled to give an address. Bernath left for Kansas prior to the issuance of the court's April 27 order and at the time of the filing of the motion to amend, the government defendants were unaware of when he was scheduled to return. Plaintiffs refused to reschedule Bernath's deposition when apprized of these facts and asserted that the request to amend the court's April 27 order was "in derogation of the Court's process and ... [was] tactically based to make the witness unavailable until such time as the Clinton White House and the Pentagon [could] 'woodshed' [Bernath] about his testimony." Pls.' Emergency Opp. to Mot. to Amend the Court's Order of April 27, 1998 at 1.

The court must first consider the propriety of Bernath's failure to appear at his deposi-

tion as scheduled on April 24, 1998. Counsel for Bernath and the government defendants included in Bernath's motion for protective order a footnote suggesting that "[h]aving moved to quash the subpoena, Mr. Bernath is entitled to withhold compliance with the subpoena until the Court decides the motion." Mot. for Protective Order at 7 (citing Wright & Miller, Federal Practice and Procedure, § 2465 at 84–85 (1994) and *Ghandi v. Police Dep't of the City of Detroit*, 74 F.R.D. 115, 118 n. 4 (E.D.Mich.1977)). Counsel reiterated this position during the status conference held on April 28, 1998 and cited to the language of Rule 37 as support. *See* Trans. of Status Conf. of April 28, 1998 at 5 ("I would draw [the court's] attention to very recent amendments to, I believe it is, Rule 37, which make it clear, at least as to parties, that they are totally protected if they file in advance of a deposition a motion for a protective order, and we were relying in good faith as well on the amendments to Rule 37 in that respect."). Plaintiffs oppose the position espoused by the government defendants and request that the court award attorneys' fees and costs incurred in canceling the deposition including costs associated with videographer appearance for the deposition.

This court must disagree with the position that the filing of a protective order completely exonerates a party's failure to appear at a scheduled deposition. Rule 37(d) states specifically that:

> If a party ... fails to appear before the officer who is to take the deposition, after being served with the proper notice, ... the court in which the action is pending on motion may make such orders in regard to the failure as are just, and among others it may take any action authorized under subparagraphs (A), (B), and (C) of subdivision b(2) of this rule. ... In lieu of any order or in addition thereto, the court shall require the party failing to act or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure unless the court finds that the failure was substantially justified or that other circumstances make an award of unjust.

Fed.R.Civ.P. 37(d). This rule clearly contemplates that a court may impose expenses and costs on a party failing to attend a scheduled deposition.

In contrast, the government defendants rely on the following additional language in Rule 37(d) to support their position that a witness is not required to attend a deposition if a motion for protective order has been filed:

> The failure to act described in this subdivision may not be excused on the ground that the discovery sought is objectionable unless the party failing to act has a pending motion for protective order as provided by Rule 26(c).

*Id.*

The plain language of Rule 37(d) and the Advisory Committee Notes to the 1993 Amendments shed definitive light on how Rule 37(d) should be read. The use of the word "may" as opposed to "shall" in the above-quoted language clearly demonstrates that it is discretionary rather than mandatory for a court to excuse an individual's failure to appear at a scheduled deposition. Moreover, the Advisory Committee Notes to the 1993 Amendments, upon which the government defendants rely, support this reading of Rule 37(d). These Advisory Committee Notes state:

> The last sentence of this subdivision is revised to clarify that it is the pendency of a motion for protective order that may be urged as an excuse for a violation of subdivision (d). If a party's motion has been denied, the party cannot argue that its subsequent failure to comply would be justified. In this connection, it should be noted that *the filing of a motion under Rule 26(c) is not self-executing-the relief authorized under that rule depends on obtaining the court's order to that effect.*

*Id.* (Advisory Committee Notes of the 1993 Amendments) (emphasis added). This passage makes clear that the failure to appear at a deposition constitutes a violation of Rule 37(d) regardless of whether a motion for protective order has been filed.

In light of these considerations, the court concludes that, contrary to defendants'

position, the proper reading of Rule 37(d) permits a court to assess attorney's fees and costs upon a party or their counsel for failing to attend a scheduled deposition despite the pendency of a motion for protective order. The filing of a motion for protective order does not automatically relieve a party from attending a deposition. However, the pendency of such a motion and whether the motion was filed in good faith may be factors the court considers in determining whether "the failure [to appear] was substantially justified or that other circumstances make an award of expenses unjust." *Id.*

█ In the instant case, the court concludes that the circumstances surrounding Bernath's failure to appear at the deposition scheduled for April 24 would make an award of sanctions unjust. Although the motion for protective order was literally filed at the eleventh hour, it appears that the late filing was necessitated in part as a result of plaintiffs' actions and plaintiffs' efforts to reschedule Bernath's deposition. Moreover, notwithstanding the fact that the motion for protective order was filed at such a time so as to preclude the court's consideration of the motion prior to the time of the scheduled deposition, the facts fail to clearly suggest that the motion was filed in bad faith. However, the court must note that in future cases, the parties should not rely on having filed a motion for protective order as a justification for a failure to appear at a deposition because as the Advisory Committee Notes to the 1993 Amendments state "Rule 26(c) is not self-executing—the relief authorized under that rule depends on obtaining the court's order to that effect." Fed.R.Civ.P. 37 (Advisory Committee Notes of 1993 Amendments).

A different conclusion is reached when this court contemplates the imposition of attorneys' fees and costs with respect to Bernath's failure to appear as ordered by the court at the deposition scheduled for April 28, 1998. This is not the first instance in which the court has encountered piecemeal disclosure surrounding the availability of a deponent. In a memorandum and order dated March 13, 1998 concerning the deposition of James Carville, this court expressed in clear language its condemnation of a party's failure to fully disclose all relevant facts to the court bearing on the availability of a deposition witness. After being served with a subpoena on February 24, 1998 for a deposition to be conducted on March 10, Carville moved this court for a protective order on March 4 and asserted that he would be in California for the filming of the television program "Mad About You" on March 10. The court granted the motion for protective order and ordered the parties to submit to the court dates for which Carville would be available for deposition. Carville neglected to convey to the court the full extent of his availability during his initial motion for protective order. Indeed, it was not until the court considered plaintiffs' motion for sanctions against Carville that the he provided a full explanation as to his whereabouts and why he was not available for deposition on the dates proposed by plaintiffs. As the court stated in rejecting Carville's motion for reconsideration:

> [Carville's counsel's] conduct has cluttered the docket of this court unnecessarily and the entire matter could have been addressed in an efficient manner had she and Carville been completely forthcoming with the court at all relevant times. Instead, counsel for Carville chose to wait until filing her Motion for Reconsideration to fully apprise this court of the nature of Carville's unavailability for deposition on the dates suggested by plaintiffs' counsel.

Mem. and Order of March 13, 1998 at 5.

█ In the instant case, the government defendants similarly failed to apprise the court of the extent of Bernath's availability when the initial motion for protective order was filed with the court. At a minimum, the government defendants should have presented the court with sufficient information in the motion for protective order to allow the court to avoid having to consider a motion to amend its order of April 27 immediately after the issuance of this order. This information would have properly included a complete disclosure of the fact that Bernath would be traveling in Kansas from April 25–28 and would be unavailable to be deposed during that time period. While it is true, as the

government defendants state, plaintiffs never sought to depose Bernath on these dates, this fact would be of greater relevance had this court granted the motion for protective order. Instead, the government defendants either assumed this court would grant the motion for protective order or chose to ignore the possibility that this court would deny this motion. In any event, if the government defendants notified the court as to Bernath's schedule for the reasonable future in their motion for protective order and this notification included the fact that Bernath would be in Kansas on April 28 with no possibility of returning on that date, the court certainly would not have ordered the deposition to go forward on April 28. Concomitantly, the government defendants would not have been forced to file a motion to amend and plaintiffs would not have incurred time and expense in responding to this motion.

■ The court does not expect the parties to present to the court the entire foreseeable schedule of a witness every time a protective order is sought. However, if a party is seeking the *postponement* of the deposition of a witness, the court believes that it is reasonable for this party to make some effort to notify the court of the witness' schedule between the time the motion is filed and the date to which the party seeks to postpone the deposition. In such a case, if the court denies the motion for protective order the court will avoid setting a date with which it is impossible for the deponent and the parties to comply.

■ Rule 37(b)(2) of the Federal Rules of Civil Procedure authorizes the award of expenses for the failure of a party to obey a discovery order unless the disobedient party establishes that the failure was substantially justified or that other circumstances make an award of expenses unjust. Fed.R.Civ.P. 37(b)(2). "District courts enjoy substantial discretion in deciding whether and how to impose sanctions under Rule 37." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir.1997). However, the plain language of this rule limits its applicability to situations where a court order has been violated. *See Brandt v. Vulcan, Inc.*, 30 F.3d

752, 756 n. 7 (7th Cir.1994) (stating that "courts have broadly interpreted what constitutes an 'order' for purposes of imposing sanctions"). In making the determination of whether to impose sanctions, Rule 37(b)(2) does not require a showing of willfulness or bad faith as a prerequisite to the imposition of sanctions upon a party. *See Brown v. United States Elevator Corp.*, 102 F.R.D. 526, 530 (D.D.C.1984) ("The Advisory Committee's notes in the 1970 amendment to Rule 37 makes clear that the word 'failure' was substituted for the word 'refusal' to eliminate any requirement that a plaintiff seeking sanctions prove willfulness."). *See also Hyde & Drath v. Baker*, 24 F.3d 1162, 1171 (9th Cir.1994) ("We have not required a finding of bad faith on the part of the attorney before imposing sanctions under Rule 37.") (citing *Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381 (9th Cir.1988)).

In the instant case, sanctions are required not because the government defendants filed a motion for protective order for some improper purpose as plaintiffs suggest, but rather because the court concludes that the failure of Bernath to appear for his deposition on April 28 constituted a violation of the court's order dated April 27, 1998 denying the government defendants' motion for protective order and ordering Bernath to be deposed on April 28. This violation, at a minimum, was the direct result of government defendants' conduct. The court finds that the failure to comply with this order was not substantially justified, and therefore, sanctions are appropriate in this case.

In reaching these conclusions, the court notes that the parties in this case had ample notice of this court's disapproval of the failure of parties to fully apprise the court of the availability of a witness when issues surrounding the timing of the conduct of a deposition arise. Counsel for the government defendants simply failed to maintain reasonable communication with Bernath, thereby necessitating additional litigation on the issues surrounding his deposition. Although the government defendants' conduct with respect to Bernath does not rise to the level of impropriety or active misleading as engaged in by Carville and his attorney, their conduct did necessitate piecemeal resolution of the issue of availability and resulted in the fail-

ure to comply with the court's April 27 order. Furthermore, plaintiffs incurred expenses due to the government defendants' failure to comply with the court's order as plaintiffs were required to file an opposition to the government defendants' Motion to Amend and appear in court to address this issue.

The government defendants offer no explanation for their failure to notify the court of Bernath's availability other than their apparent belief that the court would not require the deposition to go forward on April 28. Similarly, the court has been unable to uncover any reason justifying their failure to comply with the April 27 order. While the government defendants may assert that they did not become aware of Bernath's travel schedule until after the court denied the motion for protective order, this assertion only supports the court's conclusion that sanctions are warranted in this case. It is this very conduct—the failure to reasonably determine the availability of a witness and to notify the court of this availability when filing a motion for protective order—that provides the most compelling justification for the imposition of sanctions in this case.

The court determines that by requiring the government defendants to pay plaintiffs the reasonable expenses incurred as a result of the government defendants' disobedience of the April 27 order, this court will deter such conduct in the future and insure a more efficient administration of justice in this case. Plaintiffs' request for sanctions is granted. The government defendants shall pay plaintiffs' reasonable expenses incurred due to the failure to comply with the April 27 order in the amount of $750.

B. *Plaintiffs' Motion to Compel Further Testimony and Further Production of Documents from Bernath*

Rule 37(a) of the Federal Rules of Civil Procedure authorizes a court to afford relief to a party seeking discovery against an individual who "fails to afford the discovery sought." Fed.R.Civ.P. 37(a) (Advisory Comm. Notes). Pursuant to this rule, plaintiffs seek an order from this court compelling Bernath to provide further testimony and documents. Plaintiffs also request that this court impose sanctions on counsel for Bernath and defendants in the form of payment of plaintiffs' attorneys' fees and costs.

1. *Plaintiffs' Motion to Compel Further Testimony from Bernath*

The procedure governing plaintiffs' efforts to obtain additional testimony from Bernath has been the subject of intense dispute between the parties in this case. Because of the importance and intricacy of this issue, it is helpful to review the posture of the case up to this point. On September 12, 1996, plaintiffs filed a three-count complaint alleging violations of the Privacy Act, 5 U.S.C. § 552a, by defendants FBI and EOP, and the common law tort of invasion of privacy by Hillary Rodham Clinton, Bernard Nussbaum, Craig Livingstone, and Anthony Marceca.

■ On February 18, 1998, this court was notified that pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679, the United States was substituted for the individual defendants Nussbaum, Livingstone, and Marceca, with respect to the plaintiffs' alleged invasion of privacy claims as set forth in Count III of plaintiffs' complaint. This substitution resulted in the United States assuming the position as the sole defendant with respect to plaintiffs' invasion of privacy claims alleged in the complaint against Nussbaum, Livingstone, and Marceca.[1]

On August 12, 1997, this court issued a memorandum and order pursuant to the Lo-

---

1. "When a federal employee is sued for a wrongful or negligent act, the Federal Employees Liability Reform and Tort Compensation Act of 1988 (commonly known as the Westfall Act) empowers the Attorney General to certify that the employee 'was acting within the scope of his office or employment a the time of the incident out of which the claim arose....' 28 U.S.C. § 2679(d)(1)." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 419–20, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). Once the Attorney General makes this certification, the employee is dismissed from the action and the United States is substituted as defendant. *Id.* at 420, 115 S.Ct. 2227. In *Lamagno*, the Supreme Court determined that the Attorney General's certification could be reviewed by a federal court to determine whether the employee was actually acting within the scope of his or employment.

cal Rule 206 report filed by the parties. This order established a six month period for plaintiffs to complete all discovery relating to the issues of class certification and whether the substitution of the United States was proper in this case. The memorandum and order also contemplated that after the court's resolution of the class certification and substitution issues, an additional period of discovery would occur including both liability and individual damages.

On April 13, 1998, this court issued a memorandum and order granting the EOP's motion for protective order with respect to the depositions of Rahm Emanuel, Ann Lewis, Sidney Blumenthal, and Michael McCurry. Plaintiffs submitted that it was necessary to depose these individuals as a result of the revelation that information contained in the federal security-clearance form of Linda Tripp, a Pentagon employee, was disclosed to Jane Mayer of *The New Yorker*. Plaintiffs contended that it was likely that individuals at the White House were involved in the disclosure of this information to Mayer and therefore discovery on this issue was warranted. In light of the disputes that had arisen previously between the parties regarding the permissible scope of discovery in this case, the court clearly expressed what matters beyond the immediate scope of the issues in this case plaintiffs were authorized to explore. The court stated:

> The question becomes whether plaintiffs should be able to pursue discovery into this and other matters bearing on the obtaining and misuse of government files in order to create the inference that it is reasonable to conclude that FBI files were obtained and misused in the instant case. The court concludes that this is a permissible inference for plaintiffs to pursue in discovery.

*Alexander v. FBI*, C.A. No. 96–2123, Memorandum and Order at 7 (D.D.C. April 13, 1998). Pursuant to this memorandum and order, plaintiffs have pursued their theory that the White House had some role in the release of information from Tripp's federal security-clearance form. To this end, plaintiffs served Bernath and Kenneth Bacon, Assistant Secretary of Defense for Public Affairs, with subpoenas duces tecum and ad testificandum.

On April 28, 1998, Deputy General Counsel for DOD Harold Kwalwasser sent a letter to Bernath in response to the subpoena served on him by plaintiffs. This letter stated, in part:

> Counsel for the plaintiffs in the above-captioned cases has issued a subpoena requiring you to appear and provide testimony at a deposition. This letter authorizes you, within the limits described below, to discuss DOD official information during this deposition, in accordance with DOD Directive 5405.2 (32 C.F.R. Part 97).
>
> The court has ruled that "the recent disclosure of information contained in the federal security-clearance form of Linda Tripp" is a proper topic for discovery in this case. See Memorandum and Order, April 13, 1998 (attached). You are authorized to testify concerning this matter in accordance with the court's order, except with respect to any information that may be privileged or otherwise protected from disclosure by statute or regulation. You are rot authorized to answer questions regarding matters that are beyond the scope of the court's order. This restriction applies to factual information as well as your own opinions.

Pls.' Mot. to Compel Ex. 15. On several occasions during the course of the deposition conducted on April 30, 1998, counsel for Bernath relied on this letter in voicing objections to questions posed by plaintiffs. Typically, counsel would state:

---

In the instant case, the Attorney General, through her delegate, certified that defendants Nussbaum, Livingstone, and Marceca were acting within the scope of their employment with respect to the actions underlying this lawsuit. Accordingly, the United States was substituted for these defendants. However, pursuant to the Supreme Court's holding in *Lamagno*, this certi-

fication is in the process of being reviewed by this court. Indeed, discovery on this issue is currently being conducted. After the close of the initial period of discovery and until such time as the court reaches a determination on whether this certification was proper, the United States nonetheless remains the lone defendant with respect to count III in plaintiffs' complaint.

Our objection [is that] Mr. Bernath is not authorized to respond to information outside of the release of information that is the issue of and the subject of the [court's] order. He is not authorized to speak to the release of other information and if you want to go into those kind of questions, then you can file a [*Touhy*] request with the Department of Defense under the appropriate regulations.

Bernath Dep. at 208–09.

After the termination of the deposition, plaintiffs filed their motion to compel responses to certain questions objected to by Bernath's counsel. Three issues arise from the filing of this motion to compel: (1) whether the questions posed by plaintiffs were outside the scope of this court's April 13, 1998 memorandum and opinion and therefore irrelevant to this case; (2) whether Bernath adequately responded to the questions posed by plaintiffs; and (3) whether Bernath can be compelled to answer these questions.[2]

a. *The Relevance of Plaintiffs' Questions*

Rule 26(b) of the Federal Rules of Civil Procedure requires the disclosure of requested information not privileged and relevant to the subject matter involved in the pending action and either admissible or reasonably calculated to lead to the discovery of admissible evidence. Fed.R.Civ.P. 26(b). In their motion to compel, plaintiffs present this court with 22 questions which, in their opinion, were not adequately answered by Bernath despite the relevance of these questions to this lawsuit. Plaintiffs' motion to compel identifies these questions as follows:

1. Whether Bernath knew from his training and experience that it was impermissible to release medical and personnel information from Pentagon personnel files. Bernath Dep. at 207–08.

2. What discussions Bernath had with other Pentagon employees about information in Linda Tripp's personnel files. Bernath Dep. at 238.

3. Which members of the media, besides Mayer, called Bernath about Tripp. Bernath Dep. at 262–64.

4. What questions were asked by the media about how information about the release of information from Tripp's files came to be released to Mayer. Bernath Dep. at 272–75.

5. Whether Bernath ever spoke with Secretary of Defense Cohen on the telephone, or sent e-mails or memoranda to the Secretary or had any other kind of communication with him. Bernath Dep. at 276–78.

6. How Secretary Cohen learned that Bernath was the Pentagon official who released information from Tripp's personnel file. Bernath Dep. at 283–84.

7. Whether Bernath thought that he was being singled out by the Pentagon and Kenneth Bacon for releasing information from Tripp's personnel files. Bernath Dep. at 285.

8. Whether the statement made by Secretary Cohen on Fox Television News on April 26, 1998 about Bernath's role in the release of information from Tripp's personnel file was misleading. Bernath Dep. at 286.

9. Whether Bernath had taken any steps to correct the public record as to who was involved in the release of information from Tripp's file. Bernath Dep. at 287.

10. Whether Bernath sought legal counsel after he heard that Secretary Cohen singled him out as the one who leaked information from Tripp's files. Bernath Dep. at 287.

11. Why Bacon and Doug Wilson were not identified as being involved in the release of information from Tripp's file. Bernath Dep. at 288.

12. Whether Bernath approved of the statement by Secretary Cohen about Bernath's role even if Bernath knew

**2.** Plaintiffs also request that this court compel Bernath respond to certain questions to which Bernath's counsel objected on the basis of the attorney-client privilege. The court will consider these questions in a separate section below.

it contained false and/or misleading information. Bernath Dep. at 289.

13. Whether Bernath had ever been caught making false or misleading statements to the press concerning matters at the Pentagon. Bernath Dep. at 294–97.

14. What was the source of Bernath's authority to delete computer files [containing information regarding Tripp]. Bernath Dep. 303, 305.

15. Whether Bernath knew there was a controversy about the release of information from Tripp's files at the time he deleted information from his computer. Bernath Dep. at 308.

16. Whether Bernath provided information to Tucker Carlson, a journalist from the *Weekly Standard* which was different from the information provided to Jane Mayer from *The New Yorker* about Linda Tripp. Bernath Dep. at 321–22.

17. Whether Carlson asked questions about the Monica Lewinsky/Linda Tripp controversy. Bernath Dep. at 324.

18. Whether Bacon instructed Bernath to give the same priority to inquiries from Carlson as was done for inquiries from Mayer. Bernath Dep. at 324.

19. Who initiated or requested an inquiry into the release of information from Tripp's files. Bernath Dep. at 350–52.

20. Whether Bernath retrieved the same type of personnel form about Secretary Cohen from which he released information about Tripp. Bernath Dep. 366.

21. Whether Secretary Cohen directed Bernath not to release information from Secretary Cohen's personnel file. Bernath Dep. at 367.

22. What qualifications did Monica Lewinsky have that caused Bernath to ultimately hire her. Bernath Dep. at 135–37.

 With the exception of the questions pertaining to Monica Lewinsky and the release of information from Secretary Cohen's personnel file, these questions are clearly relevant in light of the court's April 13, 1998 memorandum and order. The questions posed by plaintiffs request information that directly bears on the distribution of the information from Tripp's files and whether the White House played any role in the release of this information.

Defendants base their relevancy objection on the contention that Bernath has testified unequivocally that he disclosed the information from Tripp's file after advising Bacon that he would do so and that no one from the White House was involved in the disclosure or directed the disclosure. Defendants also assert that there is nothing further of relevance to which Bernath can testify regarding the disclosure of the information from Tripp's security-clearance file and no reason to compel him to submit to further interrogation by plaintiffs. For these reasons, defendants believe that the questions to which plaintiffs seek to compel Bernath to respond are irrelevant to the release of the information from Tripp's file or the involvement of the White House in the disclosure.

Notwithstanding defendants' arguments, it is the conclusion of this court that with the exception of questions 20, 21, and 22, the questions posed by plaintiffs are relevant. While the answers to these questions may not establish direct White House involvement in the release of Tripp's information, as defendants suggest, they clearly fall within the scope of relevancy in this case as defined by the court and may assist plaintiffs in establishing that some other individual within DOD besides Bernath or Bacon had contact with the White House pertaining to this matter.

b. *The Adequacy of Bernath's Responses to the Relevant Questions*

 Defendants argue that Bernath responded fully and adequately to several of the questions posed by plaintiffs that now form the basis of the motion to compel and therefore, he should not be compelled to submit to additional interrogation designed to elicit responses to previously answered

questions. Upon examination of the deposition transcript, defendants' argument does have some merit. A witness cannot be compelled to submit a different answer to a question simply because plaintiffs were hoping to receive a different answer or are unable or unwilling to find the answer to the question elsewhere in the deposition. By contrast, a witness can be compelled to answer the question posed by a party if the witness's answer is nonresponsive.

Defendants contend that Bernath answered question 1 listed above at several points during the deposition. This question asked whether Bernath knew from his training and experience that it was impermissible to release medical and personnel files of DOD employees. Bernath Dep. at 204–05, 206, 214. While Bernath initially provided an evasive and nonresponsive answer, he finally stated that it was his understanding that "there's no one class of information that is always exempt [from disclosure]. There is always discussion on what's releasable and what's not releasable ... [T]here is no body of information that is absolutely protected and so a determination is made in each case." *Id.* at 214–15. This testimony demonstrates that there is no need to compel an answer to this question.

Defendants also contend that Bernath provided an adequate response to question 2 listed above which requested that he disclose discussions he had with other Pentagon employees about information in Tripp's personnel files. *See* Bernath Dep. at 238. The deposition transcript reveals that Bernath had a discussion with David Cooke, Director of Administration and Management for the Washington Headquarter Services, regarding information released from one of Tripp's forms. At the point when Bernath was about to reveal information contained in the security-clearance form as relayed to him from Cooke, his counsel provided the following instruction: "I want to caution the witness that he is not to reveal the specific information that was revealed subject to my earlier objection." *Id.* at 238. This instruction refers to counsel's previously stated objection in which he instructed Bernath not to reveal specific information from Tripp's security-clearance form during the course of the deposition without a determination of whether that revelation would violate the Privacy Act.

On February 13, 1998, this court issued a protective order pertaining to documents or information in the plaintiffs' or federal defendants' possession, custody, or control concerning personal information about an individual that is marked "Subject to Protective Order," or given some comparable marking by the producing party. *See Alexander v. FBI*, C.A. 96–2123, Protective Ord. of February 13, 1998 (D.D.C. Feb. 13, 1998). The protective order indicates that information designated as such shall only be used by the party receiving the information for purposes of litigating the instant case and shall not be disclosed to any other person or entity for any reason. Consistent with the terms of the protective order, plaintiffs may question Bernath regarding conversations he had with Cooke and counsel for Bernath may designate the testimony as subject to the terms of the protective order. This information shall be redacted from the deposition transcript and shall be preserved separately and shall not be used by plaintiffs in a manner inconsistent with the terms of the protective order.

Question 3 asks which members of the media, besides Mayer, called Bernath about Tripp. *Id.* at 262–64. The colloquy surrounding this question between plaintiffs' counsel Larry Klayman and Bernath demonstrates that Bernath fully answered this question and this colloquy is as follows:

> [Klayman]: Now, you say you're getting 30 to 40 calls a day. What other calls did you get about Ms. Tripp during that period?
>
> [Bernath]: I received numerous other media calls. I do not have a listing of them.
>
> [Klayman]: Can you remember the names of other member[s] of the media?
>
> [Bernath]: No.
>
> . . . . .
>
> [Klayman]: Did you release the information that was provided to Ms. Mayer by the Pentagon to any other reporter?
>
> [Bernath]: No.

Bernath Dep. at 262, 266. This portion of the transcript reveals that Bernath answered plaintiffs' question. This court cannot compel Bernath to remember the names of the individuals in the media to whom he has spoken and neither plaintiffs nor the transcript suggests any reason to question Bernath's credibility with respect to this response.

Question 4 listed above requests an answer from Bernath regarding what questions were asked by the media about how information about the release of information from Tripp's files came to be released to Mayer. Bernath Dep. 272–75. Counsel for Bernath simply objected to this question on the ground that it was beyond the scope of authorized discovery and no response to this question was provided. As previously discussed, this question is relevant and as such, Bernath should have provided an answer to this question.

Question 5 concerns whether Bernath spoke with Secretary Cohen by telephone, or sent e-mail or memoranda to the Secretary or had any other kind of communication with him. Bernath Dep. at 276–78. Bernath testified that he never discussed Linda Tripp with Secretary Cohen, but his counsel objected when Bernath was asked whether he spoke to Secretary Cohen by phone or sent either e-mail or memoranda to Secretary Cohen regarding Tripp. This objection was based on counsel for Bernath's belief that the questions were not permissible in light of this court's April 13, 1998 memorandum and order and DOD's communication to Bernath. Moreover, counsel for Bernath asserted that Bernath adequately and completely responded to plaintiffs' questions when he testified that he had not discussed Tripp with Secretary Cohen. The court must disagree with this position. As stated, the questions posed by plaintiffs are relevant and Bernath's response to the question of whether he discussed Tripp with Secretary Cohen should *not be construed to completely foreclose* questions pertaining to what other communications Bernath may have had with Secretary Cohen.

Questions 16, 17, and 18 address conversations Bernath had with Tucker Carlson, a reporter from *The Weekly Standard.* Although plaintiffs indicate that question 16 requested that Bernath testify regarding whether he provided information to Carlson which was different from the information provided to Mayer about Tripp and cites Bernath's deposition at pages 321–22, a review of the deposition transcript fails to reveal that such a question was posed to Bernath. Plaintiffs do ask Bernath whether Carlson asked for information about Tripp. Moreover, question 17 pertained to whether the questions posed by Carlson related to the Lewinsky/Tripp controversy and question 18 sought testimony regarding whether Bacon instructed Bernath to give the same priority to inquiries from Carlson as was done for inquiries from Mayer. In response to this line of questioning, Bernath testified that "Carlson never asked questions about Ms. Tripp." Bernath Dep. at 323. This answer completely addresses the questions posed by plaintiffs. Therefore, Bernath will not be compelled to submit to additional interrogation regarding his conversations with Carlson.

In sum, this court's review of Bernath's deposition transcript demonstrates that inadequate responses were provided to questions 2, 4–15 and 19.[3]

c. *Whether Bernath Can Be Compelled to Answer Questions 2, 4–15 and 19*

■ Having determined that certain questions posed by plaintiffs during the deposition were relevant and that Bernath failed to provide adequate responses to these questions, the court must now consider whether it is appropriate to compel Bernath to answer these questions. It is the conclusion of this court that it is entirely appropriate to compel Bernath to answer these questions and this decision does not run afoul of the Supreme Court's holding in *United States ex rel Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951).

---

**3.** Defendants do not contend that Bernath provided adequate responses to questions 4, 6–15 or 19. With respect to those questions, defendants merely asserted that the questions were irrelevant—an argument the court has previously rejected.

In *Touhy*, the Supreme Court held that a Department of Justice employee could not be held in contempt for refusing to comply with a subpoena duces tecum when his compliance had been prohibited by an order of a superior acting pursuant to valid federal regulations governing the release of official documents. *Id. Touhy* does not stand for the proposition that an agency head is free to withhold evidence from a federal court. Indeed, the Supreme Court in *Touhy* specifically refused to reach this question. *See Exxon Shipping Co. v. Department of Interior*, 34 F.3d 774, 776 (9th Cir.1994) ("[T]he Court specifically refused to reach the question of the agency head's power to withhold evidence from a court without a specific claim of privilege."). *See also* 5 U.S.C. § 301 (stating that while the head of an executive agency may prescribe regulations governing the disclosure of testimony and documents by agency employees, "[t]his section does not authorize withholding information from the public or limiting the availability of records to the public."). However, courts have interpreted this case as limiting a court's power to compel a non-party agency employee to testify in a lawsuit in certain situations. *See, e.g., In re Boeh*, 25 F.3d 761, 763 (9th Cir.1994) (employee of the FBI in case where neither the employee nor the United States was a party to the litigation "[could] not be held in contempt for failing to comply with a court order if a valid regulation required him not to comply.").

In the instant case, DOD authorized Bernath to testify "in accordance with the court's order" of April 13, 1998. As explained, this memorandum and order stated that plaintiffs were entitled to pursue discovery into the matter concerning the disclosure of information from Tripp's security-clearance form and other matters bearing on the obtaining and misuse of government files in order to create the inference that it is reasonable to conclude that FBI files were obtained and misused in the instant case. Because the court has determined that the questions posed by plaintiffs during Bernath's deposition were within the scope of discovery permitted by the April 13, 1998 memorandum and order *and* DOD authorized Bernath to testify "in accordance with the [April 13, 1998] order," the court is not compelling Bernath to testify contrary to any agency regulation or order by a DOD official. Simply stated, as between DOD and this court, this court's interpretations of its own orders must be controlling. DOD's letter to Bernath authorizing his testimony in accordance with this court's memorandum and order of April 13, 1998 demonstrates that there can be no issue with respect to the Supreme Court's holding in *Touhy* and Bernath may therefore be compelled to testify.

### 2. *Plaintiffs' Motion to Compel Further Production of Documents*

Plaintiffs contend that although the subpoena served on Bernath required him to produce documents, his document production failed to fulfill his duty under the subpoena. Specifically, plaintiffs assert that Bernath failed to produce documents that he previously turned over to DOD General Counsel that pertained to Lewinsky and Tripp and that he deleted relevant documents from his computer prior to changing jobs with DOD. Plaintiffs request that this court review *in camera* documents withheld by Bernath and those turned over to DOD General Counsel that allegedly relate to Tripp and assert that Bernath should be compelled to answer questions regarding whether he reviewed the privilege log submitted to plaintiffs. Furthermore, plaintiffs state that Bernath should be ordered to search his computer hard drive and server for deleted documents and that his computer should be delivered to the FBI for retrieval of all documents on his computer with these documents then being delivered to the court for *in camera* inspection. Finally, plaintiffs request that DOD be ordered to produce all responsive documents that fall within the scope of Bernath's employment and not merely those in Bernath's possession.

The court will turn first to plaintiffs' contention that Bernath failed to completely produce responsive documents and plaintiffs' request for the court to review documents *in camera* withheld by Bernath. In light of Bernath's erroneous perception of what is considered to be relevant in this case pursuant to the court's April 13 memorandum and order, Bernath must re-examine documents

he originally considered to be nonresponsive to determine whether these documents were appropriately withheld. Additionally, Bernath shall re-examine all responsive documents, including the redacted portions of produced documents, that were withheld under some claim of privilege or otherwise withheld from production. *See* Bernath Dep. at 81 (discussing "Responsive documents in the custody of Clifford Bernath that have ben withheld from production in response to Plaintiffs' Subpoena Duces Tecum to Clifford Bernath"); *id.* (discussing "Index to claims of privilege[d] responsive documents in the custody of Clifford Bernath that have been withheld from production in response to Plaintiffs' Subpoena Duces Tecum to Clifford Bernath"). Bernath shall produce all responsive, nonprivileged documents and shall submit all withheld documents to the court for *in camera* inspection to determine the legitimacy of each withholding.

The court will also entertain any motion to compel plaintiffs may wish to file with respect to documents in the possession of DOD. Bernath stated in his deposition that he turned over all documents relating to Tripp to the General Counsel's office. *Id.*, at 110 ("Every document that I had pertaining to Monica Lewinsky and Linda Tripp, every document that I had I turned over to the general counsel."). Plaintiffs may seek to compel the production of responsive, nonprivileged documents that DOD possesses by separate motion. However, at this time, the issue of whether DOD should be compelled to produce additional documents is not properly before the court.

■ As stated, plaintiffs also request that this court order Bernath to search his hard drive and the server for the files he deleted prior to receiving plaintiffs' subpoena. *See id.* at 303 ("[Klayman]: What was deleted [from the computer]? [Bernath]: [A]nything I didn't need in the new job."). Plaintiffs believe that it is appropriate to require Bernath to deliver his computer to the FBI for retrieval of all documents on his computer and the server and to have these documents delivered to the court for an *in camera* inspection. Defendants characterize the relief sought by plaintiffs simply as "outrageous" and "absurd" with there being "no basis for requiring the government to expend the time and resources to attempt to retrieve 'deleted' files from his hard drive." Opp. at 17.

The court must express some reservation at dismissing plaintiffs' requests as cavalierly as defendants. Despite the fact that Bernath claims to have printed out all material relating to Tripp prior to deleting this material from his hard drive, cause for concern should exist when an upper-level government employee completely deletes his hard drive when this hard drive may have information relevant to an on-going criminal investigation, let alone the instant case. While it is uncontroverted, as the government defendants assert, that Bernath deleted the hard drive prior to receiving plaintiffs' subpoena, it is highly unusual and suspect for such an action to have been undertaken by Bernath when matters relating to Tripp are being investigated by the office of the Independent Counsel. Moreover, plaintiffs were also foreclosed from attempting to ascertain pursuant to what authority Bernath deleted this information as counsel for Bernath continuously objected based on the relevance of the proposed questions. In view of these considerations, the court concludes that it is appropriate to order an examination of Bernath's hard drive and his server to determine whether responsive documents that have not been produced actually exist. Accordingly, the defendant United States shall direct the DOD Inspector General[4] to retrieve all possible documents relevant to this case from the hard drive(s) of Bernath's computer(s) and servers and shall compare these documents to those turned over to the General Counsel's office by Bernath to determine whether there are any discrepancies between the two sets of documents. If any discrepan-

---

4. Although plaintiffs request that the FBI conduct the search of Bernath's hard drive(s) and the server, it is the conclusion of the court that the Office of the Inspector General is the appropriate body to conduct this inquiry as the Inspector General is already investigating the matters at issue with respect to Bernath. *See* Deposition of Kenneth Bacon, Assistant Secretary of Defense for Public Affairs, at 170 ("[T]he entire circumstances of the release of [Tripp's] information is currently under review by the Inspector General.").

cy exists between these documents, the documents shall be delivered to the court for an *in camera* inspection for further consideration.

### 3. *Bernath's Claims of Attorney–Client Privilege*

■ Plaintiffs request that this court compel Bernath to answer 18 other questions posed by plaintiffs during the deposition that were objected to by Bernath's counsel on the basis of the attorney-client privilege. As stated, Rule 26(b) of the Federal Rules of Civil Procedure requires the disclosure of requested relevant information not privileged and reasonably calculated to lead to the discovery of admissible evidence. A motion to compel for failure to provide relevant information sought through discovery requires the court to determine if the materials or testimony sought are relevant to the action and whether all or part of the materials or testimony are covered by a privilege that prevents disclosure. *See Conant v. McCoffey,* 1998 WL 164946 (N.D.Cal. March 16, 1998) ("To succeed on its motion to compel, the government must show that the information sought is relevant, and that it does not fall under the various privileges plaintiffs have asserted."); *Bacon v. Smith Barney Shearson, Inc.,* 938 F.Supp. 98, 104 (D.N.H. 1996) ("The court finds and rules that the motion to compel must be denied, as it seeks information which is not relevant and not designed to lead to the discovery of admissible evidence within the purview of Rule 26(b)(1), Fed.R.Civ.P.").

Of these 18 questions, the first 16 seek information regarding the events occurring immediately preceding the deposition and Bernath's knowledge of his obligations to appear at the deposition as ordered by the court to proceed on April 28, 1998. The only relevance these questions may have to this litigation relates to the issue of the imposition of sanctions and costs—an issue which the court has today decided. Accordingly, Bernath will not be compelled to respond to these questions, as they are mooted by the court's decision.

■ Question 17 asks whether Bernath reviewed the privilege log before it was sub-

mitted. While it is possible that this question may not implicate the attorney-client privilege, the information sought by plaintiffs is irrelevant. The decision to withhold documents on the basis of a particular evidentiary privilege is a decision primarily committed to the discretion of counsel. Accordingly, whether Bernath reviewed the privilege log has no real bearing on the issues in this case.

■ Question 18 states "Do any of the redacted sections of this document produced in response to your subpoena relate to Linda Tripp?" Pls.' Mot. to Compel at 28 (citing Bernath Dep. at 359–61). Based solely on the deposition transcript, the court is unable to ascertain whether the attorney-client privilege was properly invoked. The transcript reveals that in response to the question, counsel for Bernath stated: "That information is privileged. If you wish to challenge the privilege, you have an available remedy. The witness is directed not to respond to that question." Bernath Dep. at 360. When plaintiffs' counsel requested an opportunity to ask other questions in an effort to determine whether the privilege was properly invoked, counsel for Bernath responded: "The objection stands." *Id.*

This court has previously cited case law noting that "[d]eponents are expected . . . to assert their objections during the deposition and to allow questioning parties to develop circumstantial facts in order to explore the propriety of the assertion of the privilege, immunity, or other objection." *Kaiser v. Mutual Life Ins. Co. of New York,* 161 F.R.D. 378, 380 (S.D.Ind.1994) (cited in *Alexander v. FBI,* C.A. No. 96–2123, Memorandum Op. at 50, 186 F.R.D. at 46 (D.D.C. May 28, 1998)). Plaintiffs were foreclosed by opposing counsel from pursuing any additional circumstantial facts to permit this court to determine the propriety of the assertion of privilege. For this reason, plaintiffs may question Bernath on matters relating to redaction of produced materials in an effort to provide this court with sufficient information so as to permit a well-reasoned consideration of the issue of the assertion of the attorney-client privilege.

### C. Plaintiffs' Request for Sanctions

 The court's granting of plaintiffs' motion to compel invites consideration of Rule 37 of the Federal Rules of Civil Procedure. Under Rule 37, the district court has broad discretion to impose sanctions for discovery violations. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 642–43, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976). Rule 37 sanctions serve a dual role: to penalize those whose conduct may be deemed to warrant a particular sanction and to deter those who might be tempted to engage in such conduct in the absence of such a deterrent. *Id.* at 643, 96 S.Ct. 2778 (addressing the dual role of such sanctions). Rule 37(a)(4)(A) permits this court to impose sanctions in the form of attorney's fees and costs in bringing the motion to compel discovery, upon a party whose conduct necessitates the filing of a motion to compel if that party's position was not substantially justified. *See Bowne of New York City, Inc. v. AmBase Corp.,* 161 F.R.D. 258, 262 (S.D.N.Y. 1995) ("[When opposition to] the motion was not 'substantially justified,' the judge must impose costs on the opposing party or his attorney."). In determining whether to impose sanctions on a party opposing a motion to compel, the language of Rule 37(a)(4)(A) provides that:

> If the motion to compel is granted or if the disclosure is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party or deponent whose conduct necessitated the motion or the party or attorney or attorney advising such conduct or both of them to pay the moving party the reasonable expenses incurred in making the motion, including attorney's fees, unless the court finds that the motion was filed without the movant's first making a good faith effort to obtain the disclosure or discovery without court action, or that the opposing party's nondisclosure, response, or objection was substantially justified, or that other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(a)(4)(A). As the terms of the rule make clear, prior to imposing sanctions pursuant to Rule 37(a)(4)(A), the court must afford the party opposing the motion an opportunity to be heard. The Advisory Committee Notes to the 1993 Amendments specify that the court can consider the issue of sanctions on written submissions as well as on oral hearings. When a movant specifically requests an award of costs and expenses incurred in filing a motion to compel and the respondent provides explanation for its actions or inactions, the respondent has had an adequate opportunity to be heard within the meaning of Rule 37(a)(4)(A). *See Augustine v. Adams,* 169 F.R.D. 664, 666 (D.Kan.1996).

 In determining whether a party is substantially justified in opposing a motion to compel, the opposing party is held "to an objective test of reasonableness (which) does not require that [the party] acted in good faith." *Bowne of New York City, Inc.,* 161 F.R.D. at 262 (citing *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). In the instant case, the court concludes that the position of the party opposing the motion for the protective order was not substantially justified with respect to the portion of the motion to compel granted by the court. The objections to plaintiffs' discovery requests for both documents and testimony and the subsequent opposition to the motion to compel were fundamentally based in large part on counsels' improper interpretations of this court's April 13, 1998 memorandum and order and the DOD letter authorizing Bernath's testimony. As discussed previously in this opinion, the interpretations advanced by counsel are simply unreasonable and resulted in the imposition of inappropriate and undue limitations on the scope of Bernath's deposition testimony and document production. Accordingly, because it is the conclusion of this court that the opposition to the motion to compel was not substantially justified, the government defendants shall pay plaintiffs' attorneys' fees and costs with respect to the portion of the motion to compel granted by the court, as well as their attorneys' fees and costs incurred in redeposing Bernath.

### III. Conclusion

For the reasons stated herein, plaintiffs' request for sanctions arising from defen-

dants' Motion for Protective Order or, in the Alternative to Quash or Modify the Subpoena of Clifford Bernath is granted and the government defendants shall pay plaintiffs' reasonable attorneys' fees and costs in the amount of $750. Plaintiffs' Motion to Compel Further Testimony and Further Production of Documents from Clifford Bernath and for Sanctions is granted in part and denied in part. Bernath shall submit to further deposition questioning with respect to questions 2, 4–15 and 19 addressed in Part II(B)(1) and question 18 addressed in Part II(B)(3) of this memorandum opinion. Plaintiffs' motion to compel further production of documents and the request for sanctions arising from the conduct of counsel at the deposition are granted to the extent set forth in this opinion.